UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

    Plaintiff,

 vs.

David Earl Gregoire, a/k/a
"mrlatebid,"

    Defendant.     Crim. No. 09-275 (ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a special assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Statements, and the

Defendant's Motion to Suppress Evidence Obtained from Search and Seizure. A

Hearing on the Defendant's Motions was conducted on October 26, 2009,[1] at which

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues presented by the Defendants' Motions. Leave was granted, and the last submission on the issues was received on November 18, 2009, at which time, the Motions were taken under advisement. See, Title 18 U.S.C.

time, the Defendant appeared personally, and by Andrew S. Birrell, Esq., and the Government appeared by Lisa D. Kirkpatrick, Assistant United States Attorney. For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied in their entirety.

## II.  Factual and Procedural Background

The Defendant is charged with one (1) Count of Interstate Transportation of Stolen Property, in violation of Title 18 U.S.C. §2314, and five (5) Counts of Mail Fraud, in violation of Title 18 U.S.C. §1341. See, Docket No. 1. The Indictment also alleges forfeitures pursuant to Title 18 U.S.C. §981(a)(1)(C) and Title 28 U.S.C. §2461(c). Id. The events which give rise to those charges are alleged to have occurred from at least as early as August of 2005, and continuing to on or about June 8, 2008, in this State and District. Id. According to the Indictment, the Defendant illegally removed merchandise from a Reed's Sporting Goods Store warehouse, in Walker, Minnesota, and later sold the stolen merchandise on eBay, which is an on-line

---

§3161(h) (1)(D); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

auction site.  Id.  As pertinent to those charges, and to the Motions now before us, the

operative facts may be briefly summarized.[2]

A.    Facts Regarding the Search Warrant and its Execution

On June 6, 2008, Captain Michael Casillas ("Casillas"), of the Little Falls

Police Department, applied for a Search Warrant in the Minnesota District Court for

Morrison County, for the residence and outbuildings at the Defendant's home address,

in order to search for stolen items and other evidence.  See, Application for Search

Warrant, Government's Exhibit No. 1, at p. 1 of 12.  Casillas' Affidavit, which was

submitted with the Search Warrant, avers that, on May 27, 2008, he met with Cass

County Investigator Todd Switajewski ("Switajewski"), who had been investigating

the case with the Cass County Sheriff's Department, and that, on June 4, 2008, he met

with Adam Arnold ("Arnold"), who is a part owner, and President of Reed's.  Id. at

p. 2.

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]here
factual issues are involved in determining a motion, the court shall state its essential
findings on the record."  As augmented by our recitation of factual findings in our
"Discussion," the essential factual findings, that are required by the Recommendations
we make, are contained in this segment of our Opinion.  Of course, these factual
findings are preliminary in nature, are confined solely to the Motions before the Court,
and are subject to such future modification as the subsequent development of the facts
and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir.
1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At that meeting, Switajewski informed Casillas that his investigation had identified the Defendant as having stolen goods from Reed's, which he subsequently sold on eBay, as far back as 2003. Id. Switajewski, apparently based upon information obtained from Arnold, informed Casillas that the items were being sold by a person with a user ID of "mrlatebid." Id. Switajewski provided Casillas with records, which had been subpoenaed from eBay, showing that the user ID "mrlatebid" was registered to the Defendant, at the Defendant's home address. Id. Switajewski also provided Casillas with PayPal[3] records showing that the Defendant had sold approximately one hundred forty thousand dollars ($140,000) worth of sporting goods since 2003. Id. at p. 3.

Arnold told Casillas that the Defendant had been a part-time employee of Reed's for approximately fourteen (14) years, and that one of his duties was to transport items from the Reed's warehouses to the retail stores. Id. at p. 2. According to Arnold, the Defendant had "complete and unfettered access" to the warehouses, and therefore, all of the items that are sold in the stores. Id. Arnold further informed Casillas that he had looked through a list of items sold by the Defendant on eBay, which had been provided by eBay, and that the items sold were "100% consistent with

_____

[3]PayPal is a service which allows parties to transfer money on-line.

items sold in Reed's Sporting Goods stores." Id.  Arnold told Casillas that the items appeared to be brand new, in their original packaging, and that most had been sold for less than retail, and some for below cost.  Id.

Arnold also informed Casillas that, suspecting Reed's property was being sold on eBay, he had purchased some items from the "mrlatebid" account, and had received packages, at a friend's home, with the Defendant's address as the return address.  Id. at p. 3.  Arnold stated that he purchased a "Lowrance LCX-27C GPS Fishfinder Combo" from "mrlatebid" on April 23, 2008, and that the serial number on that product disclosed it had been shipped to Reed's distributor.  Id.  Arnold also stated that he asked a friend to purchase a "Nikon Laser 440" from "mrlatebid" over the Memorial Day weekend, and that the serial number on that item "coincided with the large batch of Nikons Reed's Sporting Goods had purchased."  Id.  In his Affidavit, Casillas lists four (4) items recently posted to the "mrlatebid" account for sale, and that those four (4) items appeared to be current Reed's stock.  Id.  Casillas asserted that he believed that the Defendant was engaged in the theft of large amounts of sporting goods from Reed's.  Id.

On June 6, 2008, based on the Affidavit, the State District Court issued a Search Warrant, which authorized Casillas, and "others under his discretion (A) PEACE

OFFICER(S) OF THE STATE OF MINNESOTA" to search the Defendant's residence and outbuildings for a list of specifically-named sporting goods, allegedly stolen from Reed's Sporting Good Store, as well as money, and "any other sporting goods that are still in original packaging; financial records, belonging to [the Defendant and the Defendant's wife]; * * * and all computers on the property." See, Search Warrant, Government's Exhibit No. 1, at p. 5 of 12. The Warrant authorized the seizure of all of the described property and things. Id.

At the Hearing, the Government adduced the testimony of Michael J. Pender ("Pender"), who is the Chief of Police for the Little Falls Police Department, who was the Chief of Police for the investigating police department, and who personally participated in the investigation of the case. According to Pender's testimony, Casillas and Pender executed the Search Warrant at the Defendant's home on June 6, 2008, beginning at approximately ten-thirty o'clock in the morning, and continuing into the early evening hours. See, Transcript, Docket No. 34, at pp. 11, 35. Pender testified that Government's Exhibit 1, which includes the Supporting Affidavit and the Search Warrant, was the Warrant the officers relied on in executing the search. Id. at pp. 10-11.

Casillas and Pender were initially assisted by approximately three (3) or four (4) other officers from the Little Falls Police Department. Id. at p. 11. The officers were later joined by Switajewski. Id. Switajewski assisted in identifying the stolen sporting goods. Id. at pp. 11-12. Later in the day, Adam and Drew Arnold ("the Arnolds") telephoned Casillas to see if they could also assist. Id. at p. 13. Casillas asked the Arnolds to assist by identifying certain items, which were not in original packaging, that the police had found at the Defendant's home. Id. at pp. 13, 37-38. Upon their arrival, the officers escorted the Arnolds to the basement of the Defendant's home, where they identified scopes, that were attached to rifles, as Reed's merchandise, and that had not been purchased. Id. at p. 13.

The Arnolds were then escorted to the Defendant's garage, where they identified a PVC hunting ladder as a part of Reed's merchandise, as well as several display items. Id. at pp. 13, 14, 19, 23, 24, 44-46. After approximately ten (10) minutes, id. at pp. 38-39, the officers escorted the Arnolds from the Defendant's property. Id. at p. 14. The Arnolds did not search for items while they were at the Defendant's home. Id. at pp. 13-14.

The Search Warrant Return lists some two hundred and sixty-seven items that were seized from the Defendant's home. See, Government's Exhibit No. 1, at pp. 6-

12 of 12.  The list does not specify which of the items seized were found in original packaging, but it does identify which items had price stickers.  Id.  The list includes a Dell Laptop Computer ("the computer"), which was found in the basement living room; a number of empty rifle scope boxes, which were the original packaging for the scopes; several scope rings with Reed's price stickers, which are used to mount scopes to rifles; several scope mounts; fourteen (14) scopes that were not attached to rifles, and forty-three (43) rifles with scopes attached.  Id.

The Little Falls Police Department photographed each seized item individually, as it was originally found.  Transcript, supra at pp. 49-50.  According to Pender's testimony, the items not in original packaging were in plain view, intermingled with items that were in packaging, and were identified as Reed's merchandise by the Arnolds.  Id. at pp. 18-23.  The items were discovered in the utility room of the basement, in gun safes, and in secured areas on the opposite side of the basement, as well as in the detached garage.  Id. at 20;  Recording of Interrogation, Government's Exhibit No. 5 ("Exhibit No. 5").

The Defendant's computer was later searched by the United States Postal Inspection Service, for information related to eBay, for email, and for other records involving the sale of sporting goods, or other merchandise by the Defendant.  See,

Summary of Findings, Defense Exhibit No. 1, at p. 1 of 3. The Summary of Findings states that Steven T. Galbraith ("Galbraith"), who is a Forensic Computer Analyst, completed a keyword search of the computer, which was based upon specific information provided by Postal Inspector T. Cudahy, with instructions to search for information related the sale of sporting goods, or other merchandise, by the Defendant through eBay, in email, and in "other records" stored on the computer. Id. The keyword search disclosed email message files, and internet web pages, which referenced eBay transactions involving sporting goods merchandise, as well as document files containing information concerning financial stock transactions. Id. Galbraith also performed a keyword search for "Jennifer Lilyquist," which returned results related to the eBay transactions. Id. at p. 3.

B. Facts Regarding the Defendant's Statements to the Police.

According to his testimony, Pender instructed the Defendant to arrange child care for his son, when the officers arrived to execute the Search Warrant on June 6, 2008. See, Transcript, supra at pp. 33-34. Pender estimated that ten (10) minutes after arriving, he placed the Defendant "in custody," but not "under arrest," and the officers transported the Defendant to the Little Falls Police Department in a police car. Id. at pp. 12, 34. At the police station, Pender and Switajewski interrogated the

Defendant for approximately twenty-eight (28) minutes, beginning at approximately eleven-fifteen o'clock in the morning. The questioning occurred in an interrogation room at the Little Falls Police Department. See, <u>Transcript</u>, supra at p. 25.

At the commencement of the questioning, Pender advised the Defendant of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), from a card. <u>Id.</u> at 27. Upon being read the <u>Miranda</u> card, the Defendant stated, "I have nothing to hide." See, <u>Exhibit No. 5</u>. Pender asked if the Defendant understood the rights he had been read, and the Defendant responded, "Yeah." <u>Id.</u> The Defendant did not sign a written waiver, and Pender and Switajewski proceeded with questions, informing the Defendant that they had completed significant research on the case, and that they wanted to hear the Defendant's story. <u>Id.</u> Three (3) times during the interrogation, Pender stated that the Defendant's cooperation would be an "immense help" to the Defendant, that Pender would like to tell the Arnolds, and the County Attorney, that the Defendant cooperated, and that, in relation to the Defendant's cooperation, "a lot of people" were going to view the interrogation. <u>Id.</u>

Pender also memorializes on the recording that he had spoken to the Defendant before the recording began, and explaining that the Defendant would be charged no matter what the Defendant said, but that his cooperation would be "key." <u>Id.</u>

Throughout the interrogation, the Defendant paused before answering questions, corrected Switajewski and Pender, disagreed with their characterizations of his actions, asked for clarifications, and indicated that he felt "cleansed" by speaking to them. Id. In particular, approximately seven (7) minutes into the interrogation, and approximately twelve (12) minutes into the interrogation, the Defendant and Switajewski had the following exchanges:

| | |
|---|---|
| Switajewski: | You've taken things without Arnolds' permission? |
| Defendant: | * * * of their * * * aware * * *. awareness. |
| Switajewski: | Yes. Or, without their permission. |
| Defendant: | Without their awareness. |
| | *       *       * |
| Switajewski: | So you're saying * * * it was okay for you to take stuff out of the warehouse without their permission. |
| Defendant: | If that's what you're looking for me to say [inaudible] -- No. |

Id.

According to Pender's testimony, the Defendant was placed under arrest at the conclusion of the interrogation. See, Transcript, supra at p. 43-44.

III.  <u>Discussion</u>

A.    <u>The Search Warrant and its Execution</u>.

The Defendant argues that the Little Falls Police Department exceeded the scope of the Search Warrant in the following three (3) ways: 1) by allowing the Arnolds to be present during the search; 2) by seizing items not specifically listed, nor in original packaging; and 3) by searching the computer after its seizure.  The Government argues that the Arnolds' presence did not exceed the scope of the Warrant, nor does it justify suppression of the items that the Arnolds' had identified; that the unpackaged items that were seized were in plain view, and were immediately apparent as stolen items; and that the Search Warrant authorized a search of the computer.

1.    <u>Standard of Review</u>.  Since the Defendant does not challenge the Search Warrant itself, we need not address the sufficiency of the probable cause showing, but we note, in passing, that the Warrant was issued by a neutral Judicial Officer, based on an adequate showing of probable cause, and with sufficient particularity as to the places to be searched, and the items to be seized.  See, <u>Johnson v. United States</u>, 333 U.S. 10, 14 (1948); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996); <u>United States v. Gladney</u>, 48

F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993).

As pertinent here, "[i]n executing a search warrant, government officials must ensure that the search is conducted in a way that minimizes unwarranted intrusions into an individual's privacy." See, <u>United States v. Sparks</u>, 265 F.3d 825, 831 (9th Cir. 2005), overruled on other grounds, <u>United States v. Grisel</u>, 488 F.3d 844 (9th Cir. 2007). "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." See, <u>United States v. Ramirez</u>, 523 U.S. 65, 71 (1998).

a.     The Arnold's Presence at the Execution of the Search Warrant.

The Defendant cites to <u>Wilson v. Layne</u>, 526 U.S. 603, 610 (1999), for the proposition that the presence of third parties during a search may, in certain circumstances, constitute an unreasonable invasion of a defendant's legitimate expectation of privacy. We do not doubt that there may be some circumstances when the involvement of third parties invades the privacy interests of a defendant, but this is not such a case. Here, the police officers reasonably requested the Arnolds' assistance to identify specific items for seizure, as they had first-hand, direct knowledge concerning the items that were in the inventory at Reed's warehouse, and that potentially could have been stolen, and they could confirm that the specific items, which the police had uncovered outside of the original packaging, were stolen. See, <u>United States v. Bach</u>, 310 F.3d 1063, 1067 (8th Cir. 2003), cert. denied, 538 U.S. 993 (2003)(finding no Fourth Amendment violation where email technicians, with more expertise than the officers, performed the search outside the presence of the law enforcement officers).

The case law discloses a lengthy history of police officers requesting the aid of private citizens in order to accomplish a lawful search, particularly where the citizen

is the victim of a theft, who is present to identify stolen items.  See, e.g., <u>United States v. Clouston</u>, 623 F.2d 485, 487 (6th Cir. 1980); <u>Bills v. Aseltine</u>, 958 F.2d 697, 706 (6th Cir. 1992)(but finding citizen help unreasonable on the facts at hand); <u>Bellville v. Town of Northboro</u>, 375 F.3d 25, 32-33 (1st Cir. 2004)(recognizing that the use of private citizens in a search is permissible, but only when they are "serving a legitimate investigative function"); <u>United States v. Sparks</u>, supra at 831-32; <u>United States v. Miller</u>, 688 F.2d 652, 657 (9th Cir. 1982)("We refuse to prohibit the police from asking theft victims to identify whether a particular item was stolen from them as long as doing so does not somehow enable the police to intrude into a suspect's privacy vicariously when they could not do so directly.").

Indeed, in <u>Wilson v. Layne</u>, supra at 614, the Supreme Court held that the presence of third parties in a search violates the Fourth Amendment only when "not in aid of the execution of the warrant."  Although the Arnolds contacted the police in order to offer their assistance, and not vice-versa, there is no evidence that the Arnolds participated in the search for their own personal reasons.  Cf., <u>Bills v. Aseltine</u>, supra at 702 (in civil action, finding Fourth Amendment violation where security officer employee of victim entered home to search for items not on the Warrant, which listed only one target item, which had been found before the security officer arrived).  We

find no competent authority to support the Defendant's contention, that the Arnolds' presence during the search, in order to identify their stolen property, impermissibly intruded upon the Defendant's privacy beyond the Warrant's authorization.

Moreover, the officers reasonably monitored, and controlled, the Arnolds' presence at the Defendant's home. At no time did the officers leave the Arnolds alone on the premises, and the Arnolds did not search for items that were not contemplated by the Warrant and, in fact, they did not search for items at all, but simply identified items that had already been discovered by the officers. Thus, the Arnolds' presence did not impermissibly extend the search beyond the scope of the Search Warrant.

Most importantly, the Defendant has not submitted any authority to support the second step of the necessary analysis under the Fourth Amendment -- namely, that a constitutional violation, by the presence of the third parties, would require the suppression of the evidence seized. See, United States v. Strand, 761 F.2d 449, 455 (8th Cir. 1985)("[T]he question of whether [the exclusionary] rule ought to be applied * * * is distinct from the question of whether the Fourth Amendment rights of the party * * * have been violated"); see also, United States v. Hendrixson, 234 F.3d 494, 496 (11th Cir. 2000), cert denied, 534 U.S. 955 (2001). Notably, Wilson v. Layne does not specifically address that subject, as the case was a civil action, which was based

upon <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), for money damages.  See, <u>Wilson v. Layne</u>, supra at 614 n.2.

A search of the relevant case law reveals, apart from the criminal case that preceded the civil case in <u>Bills v. Aseltine</u>, supra at 701, only a single case, from the District of Pennsylvania, which was decided more than twenty-five (25) years ago, and which has never been cited, thereafter, on the point, that suppressed evidence as a result of the presence of private third parties during the execution of a Search Warrant.  See, <u>United States v. Waxman</u>, 572 F. Supp. 1136, 1149 (E.D. Pa. 1983), aff'd, 745 F.2d 49 (3rd Cir. 1984).  We find that <u>Waxman</u> is significantly different from the circumstances presented here.

In <u>Waxman</u>, the police had a Search Warrant that specified three (3) objects of stolen modern art.  <u>Id.</u> at 1138.  Upon executing the Warrant at the Defendant's home, the officers discovered that the house was full of objects of modern art.  <u>Id.</u> at 1147. The officers then invited an art expert to assist in the search, and the art expert, in turn, invited the curator of a local gallery.  <u>Id.</u>.  Neither person had any connection to the theft identified in the Search Warrant.  <u>Id.</u> at 1149.  The police occupied the Defendant's home for five (5) days, while they determined which of the art objects had been stolen.  <u>Id.</u> at 1147.  The Court determined that the art experts improperly

participated in the search, because they were not the victims of the crime, and therefore, their efforts expanded the search from the specific, based upon the contents of the Warrant, to the general, which was outside the scope of the Warrant, thereby requiring the suppression of the art objects the experts had identified.  Id. at p. 1149.

Here, the Arnolds participated in the search only to confirm that the sporting goods, which had been uncovered by the officers, were objects that had been stolen from the Arnolds' sporting goods stores.  Indeed, the situation, here, is analogous to facts that the Court, in Waxman, posited as being permissible -- that is, where the third parties participate in order "to verify the stolen nature of the other objects *already* recognized as such by the officers."  Id. at 1150.  The Arnolds presence did not transform the Warrant into an impermissible general rummaging of the Defendant's possessions, as they simply verified that objects, that the officers had probable cause to believe were stolen, were, in fact, stolen.  Accordingly, we recommend that the Defendant's Motion to Suppress the evidence identified by the Arnolds be denied.

> b.    The Plain View Doctrine.  "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  United States v. Gillon,

348 F.3d 755, 759 (8th Cir. 2003), cert. denied, 541 U.S. 968 (2004), quoting

Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also, United States v. Murphy,

261 F.3d 741, 743 (8th Cir. 2001)("A law enforcement officer is permitted 'to seize

evidence without a warrant when the initial intrusion is lawful, the discovery of the

evidence is inadvertent, and the incriminating nature of the evidence is immediately

apparent."), quoting United States v. Raines, 243 F.3d 419, 422 (8th Cir. 2001), cert.

denied, 532 U.S. 1073 (2001). "Observing objects in plain view violates no

reasonable expectation of privacy, which obviates the need for a search warrant."

United States v. Banks, 514 F.3d 769, 773 (8th Cir. 2008), cert. denied, --- U.S. ---,

128 S.Ct. 2919 (2008), citing Horton v. California, 496 U.S. 128, 133 (1990).

"'The "immediately apparent" requirement means that officers must have

"probable cause to associate the property with criminal activity."'" United States v.

Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997), quoting United States v. Hatten, 68

F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting, in turn,

United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068

(1991). "Probable cause demands not that an officer be 'sure' or 'certain' but only

that the facts available to a reasonably cautious man would warrant a belief 'that

certain items may be contraband or stolen property or useful as evidence of a crime.'"

Id., quoting United States v. Hatten, supra at 261, quoting, in turn, United States v. Garner, supra at 62, quoting, in turn, Texas v. Brown, 460 U.S. 730, 742 (1983). In reviewing probable cause for the seizure of an object in plain view, we look to the information known to the officers, outside the Warrant and its supporting Affidavit. See, United States v. Weinbender, supra at 1330.

First, plainly the officers were lawfully on the Defendant's premises, pursuant to a valid Search Warrant. Second, the rifle scopes were discovered within a gun storage unit, which the officers had the authority to open, in order to look for the stolen sporting goods that were listed in the Warrant, and that could reasonably be expected to be within. See, United States v. Hughes, 940 F.2d 1125, 1127 (8th Cir. 1991), cert. denied, 502 U.S. 896 (1991). The Search Warrant specifically authorized the officers to enter the detached garage, where the hunting ladder and the display items were discovered. The Defendant's primary argument, citing to United States v. Clark, 531 F.2d 928 (8th Cir. 1976), is that the scopes, and the other evidence discovered out of the original packaging, were not immediately apparent as incriminating evidence. We address the scopes, and the ladder and display items, separately.

After a close review of the Record, we find that the incriminating nature of the scopes was immediately apparent. The Record discloses that all of the items seized were in close proximity to each other, in the Defendant's basement, or garage. Government Exhibits 3, and 4, are photographs of two (2) areas of the basement -- the utility closet, and a gun cabinet. The photographs show that the utility closet is strewn with shipping boxes, packing materials, camouflage clothing, and outdoor equipment. Pender credibly testified, we find, that the shipping boxes were addressed to the Reed's warehouse. See, <u>Transcript</u>, supra at p. 17. Further, Government Exhibit 2 depicts thirteen (13) scope boxes that were immediately adjacent to three (3) rifles in the cabinet, and the Return lists a considerable number of empty scope boxes, as well as scopes still in boxes, that were discovered in the same vicinity.

While it is not clear if the photographed scope boxes contained scopes, Pender credibly testified that the unmarked items were intermingled with the marked items, in their original packaging, which interconnects the evidence to the alleged crime. We find that, when the officers discovered numerous empty scope boxes in the same area as numerous rifles with scopes attached, intermingled with several scopes still in their boxes, and in close proximity to other sporting goods clearly marked as Reed's merchandise, they had probable cause to believe that the mounted scopes were

associated with the alleged criminal activity -- the theft of sporting goods, going back as far as 2003.[4]

The circumstances, here, are markedly distinct from those in United States v. Clark, supra at 933, where the Court upheld the suppression of a pistol that was seized during the execution of a Search Warrant for illegal drugs.  The Court concluded that the pistol was not discovered in plain view, because there was no nexus between the pistol, and the crime of distributing controlled substances, and because the officers were not "motivated by any specific, reasonable cause to believe the pistol was evidence of any crime," when they recorded the serial numbers of a vast number of personal and business items, at the defendant's motorcycle shop, to trace.  Id. at 932, and 931.

In Clark, the Court also concluded that the pistol's incriminating nature was not immediately apparent, since the officers had to provide the serial number to a Federal agent, who was off of the premises, and who then traced the gun's origin.  Id. at 932.

---

[4]To the extent that the Defendant argues that, since the Warrant, which was based on probable cause, did not specify goods that were outside of their original packaging, no probable cause could have existed as to those items, we reject that argument, since the argument is squarely rejected by the plain view doctrine, which allows for the seizure of items, without a Warrant, where probable cause exists to the items' incriminating nature, and it is observed in plain view.  See, e.g., Horton v. California, 496 U.S. 128, 136 (1990).

Here, the Defendant argues that the fact that the Arnolds' identified the scopes demonstrates that their incriminating nature was not immediately apparent. However, as we have detailed, we find a clear nexus between the scopes, and the alleged on-going theft of sporting goods, which provided probable cause to believe that the scopes, therefore, were evidence of the criminal activity, that had been described in the Search Warrant Application, even without the Arnold's assistance in identifying those scopes. See, United States v. Pindell, 336 F.3d 1049, 1055 (D. D.C. 2003), cert. denied 540 U.S. 1200 (2004)(notebook found next to police uniform, where the victim had stated the defendant had written incriminating information in a notebook while dressed in a police uniform, immediately apparent as incriminating for plain view seizure).

The officers' effort to confirm that, indeed, the items were stolen from Reed's, does not invalidate that showing of probable cause. See, Whren v. United States, 517 U.S. 806, 813 (1996)("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." [internal quotations omitted]); United States v. Knights, 534 U.S. 112, 122 (2001)(extending the Whren rule to searches that are

based on reasonable suspicion); see also, <u>Bradway v. Gonzales</u>, 26 F.3d 313, 320 (2nd Cir. 1994)(in a civil action, finding plain view doctrine satisfied where the officers had a description of a unique, stolen stove which matched the defendant's, even though officers confirmed those facts by examining the stove further).

We also find that the officers had probable cause to associate the hunting ladder, and the display items, with the criminal activity that was alleged in the Search Warrant Application.  The hunting ladder in the detached garage was discovered in close proximity to other large sporting goods that were associated with hunting, such as a tree stand shooting bench, and a compound bow.  The display items are unusual items for personal ownership, and were likely to belong to a sporting goods retailer. After a review of the Search Warrant and Return, as well as Pender's testimony, which we find credible on this issue, we conclude that the scopes, ladder, and display items, that were not specified in the Warrant, were discovered in "plain view," so as to justify the officers' seizure of those items.[5]  Since the Arnolds' presence was not

_____

[5]Though unnecessary in these circumstances, the Arnold's confirmation, that those items were stolen, would be a permissible fact in the compilation of probable cause.  See, <u>United States v. Garces</u>, 133 F.3d 70, 75 (D. D.C. 1998)("[A]lthough the phrase 'immediately apparent' sounds temporal, its true meaning must be that the incriminating nature of the item must have become apparent, in the course of the search, without the benefit of information from any unlawful search or seizure."); <u>United States v. Meyer</u>, 827 F.2d 943, 945 (3rd Cir. 1987)(probable cause to seize

unlawful, and because the officers had probable cause to seize the scopes even before the Arnolds identified them, we recommend that the Defendant's Motion to Suppress this evidence also be denied.

        c.    The Computer Search.

        The Defendant argues that the Search Warrant authorized only the seizure of the computer, and that a separate Search Warrant was required in order to search the computer for records, and therefore, the search that was completed by the Postal Inspector was outside the scope of the Warrant. In response, the Government urges that the Search Warrant, which specifically authorizes the seizure of the computer, also authorized the computer search for records, and no separate Warrant was required.[6]

_____

forty-seven (47) watches discovered in crawl space, near known stolen items, where the defendant could not confirm ownership), abrogated on other grounds, Horton v. California, supra; see also, Perlman v. City of Chicago, 801 F.2d 262, 267 (7th Cir. 1986), cert. denied, 480 U.S. 906 (1987)(in a civil action against police department, where the Court found probable cause for the seizure of jewelry from store when the victim of the burglary identified the stolen jewelry intermingled with other jewelry).

[6]We do not address the Government's argument, based upon United States v. Leon, 468 U.S. 897 (1984), that the evidence should not be suppressed because the officers relied on the Search Warrant in good faith, as we find that argument to be inapposite here. The Leon exception to the suppression of evidence applies when police officers, in executing a search, rely on an invalid Search Warrant. Id. at 920. It does not apply where the officers err in exceeding the scope of a valid Warrant.

We find that the Search Warrant of June 6, 2008, authorized the search of the

Defendant's computer. The Defendant cites no authority to support his assertion, that

a separate Warrant is required in order to search a computer that was lawfully seized

pursuant to a valid Search Warrant.[7]   We find the Court's opinion in United States v.

Upham, 168 F.3d 532, 536 (1st Cir. 1999), cert. denied, 527 U.S. 1011 (1999),

instructive on this point.  Citing cases which allowed the processing of items such as

film, and bloodstains, in order to extract the information contained therein, the Court

See, Id.(Excluding evidence will not affect the officer's future conduct, "when an
officer acting with objective good faith has obtained a search warrant from a judge or
magistrate and acted within its scope."); United States v. Strand, 761 F.2d 449, 456
(8th Cir. 1985). Here, the Defendant does not contend that the Search Warrant was
invalid, but rather, urges that the officers exceeded the scope of the valid Warrant in
their search.

While we have previously distinguished Strand on a prior occasion, see, United
States v. Foster, 1997 WL 685371 at *17 n. 23 (D. Minn., May 27, 1997), we did so
on grounds not applicable here, as the Defendant has not argued that, by including his
computer in the Warrant, the Warrant was impermissibly overbroad, but rather, he
simply contends that, in searching the computer, the officers exceeded the scope of
the search the Warrant authorized.

[7]We accept the Defendant's contention, that a person ordinarily has a legitimate
expectation of privacy in his or her personal computer.  See, United States v. Stults,
575 F.3d 834, 842 (8th Cir. 2009).  Nevertheless, that threshold inquiry, which forms
the sole basis for the Defendant's argument in his Memoranda, does not address the
pertinent issue raised by the Defendant's Motion to Suppress; namely, whether the
Search Warrant in question authorized a search of the computer that was seized in the
Defendant's home.

rejected the defendant's argument, there, that a separate Search Warrant was required when the original Search Warrant authorized the seizure of the computer, because the images, for which the Warrant authorized the search, were inside the computer, and therefore, we contemplated by the Warrant. Id.; see also, United States v. Ross, 456 U.S. 798, 824 (1982)(automobile search); United States v. Giberson, 527 F.3d 882, 887 (9th Cir. 2008)(reviewing a Search Warrant specific to a computer, and rejecting the defendant's arguments for "treating computers differently from storage mediums such as filing cabinets and briefcases"); United States v. Grimmett, 439 F.3d 1263, 1268-69 (10th Cir. 2006); United States v. Kufrovich, 997 F. Supp. 246, 264 (D. Conn. 1997), rejected on other grounds, United States v. Griffith, 284 F.3d 338 (2nd Cir. 2002); United States v. Carey, 172 F.3d 1268, 1273 (10th Cir. 1999)(search of a computer for child pornography was outside the scope of a Warrant which authorized a search for evidence of drug selling).

Here, the Search Warrant authorized a search for financial records, which related to the sale of sporting goods, and which could reasonably be expected to be stored in the computer. We are unable to distinguish the usual case, where a Search Warrant authorizes a search of a defendant's premises for certain financial records, but does not expressly specify that the search could encompass the interior of file

cabinets.  We seriously doubt that there could be a valid objection that, in searching the file cabinet drawers for financial records, law enforcement was exceeding the scope of the authorized search.  In sum, we find that the Search Warrant in contest here authorized a search of the computer as well.

We read, however, the Defendant's argument to include a contention that the computer search that was conducted by Galbraith exceeded the scope of the Warrant. As a threshold question, we briefly address the Search Warrant's particularity as to the computer search.  Like any other search, the search of a computer hard drive must be for particular information, based on the Search Warrant Application, and cannot be a general search.  See, <u>United States v. Otero</u>, 563 F.3d 1127, 1132 (10th Cir. 2009), cert. denied --- U.S. ---, 130 S.Ct. 330 (2009).

Although the Search Warrant allows "any computer" to be searched, we find that reference, in the context of the rest of the Warrant, sufficiently particular to limit a search of the computer.  <u>Id.</u> at 1133; <u>Andresen v. Maryland</u>, 427 U.S. 463, 480-81 (1976); <u>United States v. Pindell</u>, supra at 1053; <u>United States v. Peterson</u>, 2001 WL 1678774 at *5 n. 7 (S.D. Iowa November 2, 2001)(Warrant authorizing computer search not a general Warrant, because the "affidavit credibly indicated * * * that [the defendant] used the Internet -- and hence, most likely a computer -- in an attempt to

attain child pornography videos from the Blue orchid site."); <u>United States v. Cartier</u>,

543 F.3d 442, 447-48 (8th Cir. 2008), cert. denied --- U.S. ---, 129 S.Ct. 1390

(2008)(declining to create a blanket requirement that computer search strategy be

specified in the Warrant for particularlity).

Here, reading the Warrant as a whole, the search of the computer is clearly

limited to information relating to "the sales of the above-listed items" and "other

sporting goods." Therefore, the Warrant authorized a search of the Defendant's

computer for references to the sale of sporting goods on the online auction site eBay.[8]

In executing the search, the forensic analyst made a copy of the computer's hard drive,

---

[8]Galbraith's report states that he had instructions to search the computer for records involving the sale of sporting goods, "or other merchandise." We find that this portion of the computer search exceeded the scope of the Warrant. It is axiomatic that a Search Warrant, and the plain view doctrine, may not be used to justify an exploratory search for evidence of unrelated criminal activity, outside the scope of the Warrant. See, <u>United States v. Clark</u>, 531 F.2d 928, 931-32 (8th Cir. 1976); <u>United States v. Carey</u>, 172 F.3d 1268, 1272 (10th Cir. 1999), citing <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 466 (1971). Here, the Warrant referenced only the sporting goods equipment, and there is nothing to indicate what "other merchandise," that the Defendant may have sold over the Internet, was stolen. However, from the Indictment, which charges only the theft of sporting goods, it does not appear that any evidence was discovered on the computer that related to "other merchandise," and so, that issue becomes moot.

We further note that, though the Defendant did not raise the issue, the search for "Jennifer Lilyquist" falls within the scope of the Warrant, as it related to the eBay online auction webpages.

and then performed limited keyword searches on that copy, segregating the information discovered from the rest of the computer's data. We find this to be a reasonable approach. See, e.g., <u>United States v. Brooks</u>, 427 F.3d 1246, 1252 (10th Cir. 2005), cert. denied, 546 U.S. 1222 (2006). Accordingly, we recommend that the Defendant's Motion to Suppress the evidence seized from his computer be denied.

    B.    <u>The Defendant's Statements</u>.

        The Defendant argues that, in practical effect, he was placed under arrest when the officers arrived to execute the Search Warrant, and transported him to the police station in a police car. According to the Defendant, at that time, the police did not have probable cause to arrest him, and therefore, his assertedly illegal arrest tainted all of his statements obtained thereafter. At the Hearing, Pender stated that he considered the Defendant to be "in custody," when the Defendant was transported to the police station, but not "under arrest." As a consequence, the Government argues that the Defendant was not arrested until after his statements were made, and the search underway, so that his statements were not tainted.

    At the outset, we note our skepticism that there is a qualitative difference between being "under arrest," and "in custody." Indeed, "[t]he ultimate inquiry to determine custody for <u>Miranda</u> purposes is whether there was a formal arrest, or

restraint from freedom of movement of the degree associated with a formal arrest." See, United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005), citing California v. Beheler, 463 U.S. 1121, 1125 (1983).

The distinction between an investigatory detention, and an arrest, is important because, while both are seizures, and therefore, are protected by the Fourth Amendment, "an investigative stop must be supported by reasonable articulable suspicion that criminal activity is afoot, whereas an arrest must be supported by probable cause." See, United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995), quoting United States v. Miller, 974 F.2d 953, 956 (8th Cir. 1992), citing, in turn, Terry v. Ohio, 392 U.S. 1, 25-31 (1968).

"An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005), quoting United States v. Bloomfield, supra at 916; Florida v. Royer, 460 U.S. 491, 500 (1983). "Similarly , the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.; United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). Accordingly, "[a] 'de facto arrest occurs when the officer's conduct is more intrusive than necessary for an investigative stop.'" United

States v. Hill, 91 F.3d 1064, 1070 (8th Cir. 1996), quoting United States v. Bloomfield,

supra at 916-17; see, United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir.

1999)("A Terry stop may turn into an arrest if the stop lasts for an unreasonably long

time or if officers use unreasonable force.").

In determining whether a police encounter with a citizen is a de facto arrest, our

Court of Appeals has reasoned as follows:

> Time is an important factor in distinguishing between an
> investigative stop and a de facto arrest:  There is "no rigid
> timeline on Terry stops," United States v. Sharpe, 470 U.S.
> 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but
> a stop may be too long if it involves "delay unnecessary to
> the legitimate investigation of the law enforcement officers,
> id. at 687, 105 S.Ct. at 1576.  Another factor is "the degree
> of fear and humiliation that the police conduct engenders.
> United States v. Lego, 855 F.2d 542, 544-45 (8th Cir.
> 1988)(citation omitted).  The courts have also held that
> transporting a suspect to another location or isolating him
> from others can create an arrest.  See, [United States v.]
> Rose, 731 F.2d [1337, 1342 (8th Cir. 1984), cert. denied 469
> U.S. 931 (1984)].  Additional factors that may weigh in
> favor of an arrest are subjecting a suspect to unnecessary
> delays, handcuffing him, or confining him to a police car.

United States v. Bloomfield, supra at 917; see, United States v. Ruiz, 412 F.3d 871,
879-80 (8th Cir. 2005), cert denied, 546 U.S. 994 (2005); United States v. Dixon, 51
F.3d 1376, 1380 (8th Cir. 1995); United States v. Hawkins, 59 F.3d 723, 727 (8th Cir.
1995), cert. granted, and judgment vacated on other grounds, 516 U.S. 1168 (1996).

Here, the Defendant was removed from his home, told to arrange child care for his son, and transported, by the police in a squad car, to the police station, where he was then informed of his <u>Miranda</u> rights, and interrogated.

The Government has proffered no evidence which shows that the Defendant consented to going to the police department. While the Defendant was not placed in handcuffs, there is no evidence that he was told that he could leave and, in any case, he was reliant on the police for his transportation, as they had transported him there. Pender believed the Defendant to be "in custody," and therefore, Pender would not likely have allowed the Defendant to leave. Further, the officers told the Defendant to arrange child care for his son, which would reasonably cause the Defendant to believe that he was no longer in control of his own whereabouts.

As a result, we find that a reasonable person in the Defendant's position would have felt restraint to the same degree as in a formal arrest, and therefore, the Defendant was under <u>de facto</u> arrest. See, <u>Dunaway v. New York</u>, 442 U.S. 200, 212 (1979); <u>United States v. Smith</u>, 549 F.3d 355, 360 (6th Cir. 2008)("[U]nder most circumstances, the police 'cross the line' between an investigatory detention and a custodial arrest, when a person is 'remove[d] from * * * [a] place in which he is

entitled to be and transport[ed] * * * to the police station.'"), citing United States v. Butler, 223 F.3d 368, 374 (6th Cir. 2000).

There is no dispute that an Arrest Warrant had not been issued when the Defendant was transported to the Little Falls Police Station. However, when a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted. See, United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), cert. denied, 210 U.S. 883 (1993), citing United States v. Watson, 423 U.S. 411 (1976). Whether an arrest was unlawful, therefore, turns on whether the officers, collectively, had probable cause to arrest the Defendant when they arrived at his home on June 6, 2008, in order to execute the Search Warrant.

"Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a

reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting <u>Olinger v. Larson</u>, 134 F.3d 1362, 1366 (8th Cir. 1998); <u>Tokar v. Bowersox</u>, 198 F.3d 1039, 1046-47 (8th Cir. 1999), cert. denied, 531 U.S. 886 (2000)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense."). This is an inquiry into objective facts; whether the officer knew he or she had probable cause to arrest is not dispositive. See, <u>United States v. Abadia</u>, 949 F.2d 956, 959 n. 14 (8th Cir. 1991), cert. denied, 503 U.S. 949 (1992), citing <u>Klingler v. United States</u>, 409 F.2d 299, 304 (8th Cir. 1969), cert. denied, 396 U.S. 859 (1969).

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'" <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v. Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983). We recognize, and accept, that an officer engaged in an arrest need not personally have found probable cause in order to

lawfully effect the arrest. As the Court explained, in <u>United States v. Gillette</u>, 245

F.3d 1032, 1034 (8th Cir. 2001), cert. denied, 534 U.S. 982 (2001):

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory, United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000), to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure. Under this rationale, the validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if * * * some degree of communication exists between them," id. See also United States v. Morales, 238 F.3d 952, 953 (8th Cir. 2001), and United States v. Twiss, 127 F.3d 771, 774 (8th Cir. 1997). The requirement that there be a degree of communication serves to distinguish between officers functioning as a "search team," United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989), and officers acting as independent actors who merely happen to be investigating the same subject.

We keep in mind, however, that "[p]robable cause does not require a prima facie

showing of criminal activity, but only the probability of criminal activity." See, <u>Tokar</u>

<u>v. Bowersox</u>, supra at 1047.

Here, based on the Affidavit submitted with the Search Warrant, and Pender's

testimony as to the collective knowledge of the police officers at the time of the

search, we find that the officers had probable cause to arrest the Defendant, based upon the information provided by eBay, PayPal, and Arnold.

We recognize that the vast majority of the information in Casillas' Affidavit was derived from Arnold, but "law enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable." See, Clay v. Conlee, 815 F.2d 1164, 1168 (8th Cir. 1987), citing Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985), cert. denied, 479 U.S. 816 (1986)("[T]he skepticism and careful scrutiny usually found in cases involving informants * * * is appropriately relaxed if the informant is an identified victim.")  Here, Arnold, who is a part-owner and President of Reed's, informed the officers that he had purchased two items on eBay, from "mrlatebid," which had serial numbers corresponding to Arnold's stock at Reed's, and which were shipped to him with the Defendant's name, and residence, as the return address.

The connection between "mrlatebid," and the Defendant, was confirmed by the eBay and PayPal records, which disclosed that "mrlatebid" was the Defendant's user ID on eBay.   Arnold's assertion, that "mrlatebid" was illegally selling Reed's property, was also corroborated by the information from eBay, and PayPal, that

"mrlatebid" had sold more than one-hundred forty thousand dollars ($140,000) worth of sporting goods, and that most of those items were sold below retail, and some below cost, and appeared to be sold by "mrlatebid" in their original packaging. Accordingly, we conclude that Arnold was a reasonably reliable source of information.

From Arnold, the officers also learned that the Defendant was a part-time employee of Reed's, that he was authorized to transport merchandise from Reed's warehouses to its retail stores, and that he had "unfettered" access to those warehouses, in which all of the merchandise, which is sold in the Reed's stores, was stored. We find that this showing, as combined with the volume of the Defendant's sales of sporting goods on eBay, constituted probable cause to believe that the goods, which were uncovered in the Defendant's premises, had Reed's warehouses as their likely source. The officers also had Arnold's assurances that the Defendant had not been authorized to remove the merchandise from the warehouse for his own use, or to offer them for sale on eBay. Therefore, the officers had probable cause to believe that the Defendant was engaged in theft, from the Reed's warehouses, of sporting goods.

In addition, the officers knew that the Defendant had recently posted four (4) new items on eBay, which corresponded with stock that Reed's was currently selling, thereby having a reasonable basis to believe that the crime they were investigating was on-going. As a consequence, since the police had probable cause to arrest the Defendant when they arrived at his house on June 6, 2008, we conclude that his Fourth Amendment right against an unreasonable seizure was not violated by his <u>de facto</u> arrest.

Having concluded that the Defendant's <u>de facto</u> arrest was lawful, we need not proceed to the second prong of the inquiry -- whether the absence of probable cause for an arrest supports the suppression of the Defendant's subsequent statements as the "fruit of the poisonous tree." See, <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963). However, in the interest of completeness, we briefly address that point.

"When determining whether sufficient attenuation exists, we must focus on three specific factors: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." <u>United States v. Simpson</u>, 439 F.3d 490, 495 (8th Cir. 2006), citing <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975).

"Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." United States v. Vega-Rico, 417 F.3d 976, 979 (8th Cir. 2005), cert. denied, 547 U.S. 1073 (2006), quoting United States v. Yousif, 308 F.3d 820, 832 (8th Cir. 2002), citing, in turn, Wong Sun v. United States, supra at 485. "[F]or the statements given to police after an unlawful arrest to be admissible, the statement must not only be voluntary under Fifth Amendment standards but must not be the result of an unconstitutional seizure." United States v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001), cert. denied, 534 U.S. 896 (2001), citing Brown v. Illinois, supra at 602; see also, United States v. Vega-Rico, supra at 979 ("To break the causal chain between an illegal arrest and a statement given later, the statement must be 'sufficiently an act of free will to purge the primary taint.'"), quoting United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994), cert. denied, 514 U.S. 1134 (1995), quoting, in turn, Wong Sun v. United States, supra at 486.

Accordingly, in addition to the Brown factors, we must consider whether the Defendant was advised of his Miranda rights prior to making his statement. See, United States v. Reinholz, supra at 779. However, "[t]he giving of Miranda warnings,

followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility."  United States v. Vega-Rico, supra at 979.

As to the first Brown factor, the Record demonstrates that approximately forty-five (45) minutes after Pender served the Search Warrant, and had the Defendant transported to the police station, Pender and Switajewski began questioning the Defendant.  Our Circuit has held that ten (10) minutes is a meaningful lapse in time, to allow admission of the evidence, in the context of an illegal stop and consent to search an automobile.  See, United States v. Herrera-Gonzalez, 474 F.3d 1105, 1112 (8th Cir. 2007)(a ten (10) minute interval, the defendant's consent, and lack of police misconduct, sufficiently attenuated the evidence from the illegal stop).

In the context of an interrogation after an unlawful arrest, however, our Circuit precedent upholding the denial of Motions to Suppress involves much longer periods of time.  See, e.g. United States v. Hernandez-Hernandez, 384 F.3d 562, 566 (8th Cir. 2004)(five (5) days); United States v. Vega-Rico, supra at 980 (four (4) days).  Other Courts have addressed the question with mixed results.  See, Taylor v. Alabama, 457 U.S. 687, 691 (1982)(six (6) hours insufficient to attenuate confession from illegal investigatory arrest); United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009)(confession given the day after illegal arrest would be sufficiently attenuated);

Logan v. United States Offices of Gov't for Welfare & Social Security Admin., 2003

WL 22077741 at *5 (D. Minn., August 22, 2003)(six (6) hours between initial,

unlawful entry, and the defendant's written statement sufficient for attenuation).  In

this context, assuming an illegal arrest, we find that the extremely brief time lapse

between the Defendant's arrest at his home, and the beginning of the interrogation,

weighs against attenuation.

As to the second Brown factor, it is clear from Pender's testimony, and from the

interrogation, that Pender and Switajewski had, after arresting the Defendant but

before arriving at the interrogation, participated in the lawful search, and had seen

many of the items in the basement, particularly the items in the gun safes.  We find

that the items discovered in the gun safes, combined with the information already

known to the officers, provided probable cause, independent from any statements

made by the Defendant, prior to the start of the interrogation.  This independent

probable cause weighs in favor of attenuation, as an intervening circumstance.  See,

United States v. Ramires, 172 F. Supp.2d 1208, 1220 (D. Neb. 2001), aff'd, 307 F.3d

713 (8th Cir. 2002), cert. denied, 538 U.S. 1006 (2003)(independent development of

probable cause through legal search sufficient to attenuate the taint of an illegal de

facto arrest); Miranda v. Leibach, 394 F.3d 984, 990 (7th Cir. 2005)(statement to

police by of legally-arrested witness, implicating the defendant, was a sufficient intervening circumstance); see also, <u>United States v. Vega-Rico</u>, supra at 981-82 (Bye, J., concurring, to note that the Eighth Circuit first allowed unilateral police conduct to qualify as an intervening circumstance in <u>United States v. Hernandez-Hernandez</u>, supra).

The third <u>Brown</u> factor we are to assess is the misconduct, if any, of the officers. Here, while the officers did not obtain an Arrest Warrant when they obtained the Search Warrant, there is no requirement that the police apply for an Arrest Warrant when probable cause first arises, <u>United States v. Davis</u>, 21 F. Supp.2d 979, 989, n. 9 (D. Minn. 1998), aff'd, 174 F.3d 941 (8th Cir. 1999), citing <u>Hoffa v. United States</u>, 385 U.S. 293, 309-10 (1966). Moreover, we find that the officers' conduct did not have a "quality of purposefulness," see, <u>Brown v. Illinois</u>, supra at 605, and there is nothing in the Record to show that the officers had ulterior motives in arresting the Defendant when they began executing the Search Warrant. Therefore, we find that this factor also weighs in favor of attenuation.

Since the Defendant has raised the involuntariness of his statements at the police station, on June 6, 2008, as an independent basis for the suppression of those statements, we address our consideration of <u>Miranda</u> as a factor in the attenuation

analysis, and simultaneously consider the question as an independent basis upon which to seek suppression.

1.    Standard of Review.  The Defendant argues that the statements, which he provided on June 6, 2008, were not voluntary, and that he did not validly waive his rights.  Here, all of the parties agree that, at the time that the Defendant's statements were taken, the Defendant was in official custody, which requires the administration of a Miranda warning if the statement is to be admissible in the Government's case-in-chief.  See, Thai v. Mapes, 412 F.3d 970, 976 (8th Cir. 2005), cert. denied, 546 U.S. 1039 (2005)("In Miranda, the Court held that police officers must inform a suspect of his Fifth Amendment privilege against self-incrimination prior to initiating a custodial interrogation.").

"A suspect may then waive th[o]se rights provided that the waiver is knowing, voluntary, and intelligent."  Id. at 977, citing Miranda v. Arizona, supra at 444.  "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimation, coercion,

or deception." United States v. Bell, 477 F.3d 607, 612 (8th Cir. 2007), quoting Thai

v. Mapes, supra at 977.

Of course, "[a] statement is not voluntary if the totality of the circumstances

shows the defendant's will was overborne." United States v. Annis, 446 F.3d 852,

855 (8th Cir. 2006), cert. denied, 551 U.S.1163 (2007). As the Supreme Court has

recently explained:

> The due process test takes into consideration "the totality of
> all the surrounding circumstances -- both the characteristics
> of the accused and the details of the interrogation."
> [Schneckloth v. Bustamante, 412 U.S. 218, 226 (1973).]
> See also Haynes [v. Washington, 373 U.S. 503, 513]
> (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962);
> Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the
> circumstances attendant upon the confession must be taken
> into account"); Malinski v. New York, [324 U.S. 401, 404]
> (1945)("If all the attendant circumstances indicate that the
> confession was coerced or compelled, it may not be used to
> convict a defendant"). The determination "depend[s] upon
> a weighing of the circumstances of pressure against the
> power of resistance of the person confessing." Stein v.
> New York, [346 U.S. 156, 185] (1953).

Dickerson v. United States, 530 U.S. 428, 434 (2000).

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, <u>Reck v. Pate</u>, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, <u>Leyra v. Denno</u>, 347 U.S. 556, 561 (1954). See also, <u>Withrow v. Williams</u>, supra at 693 (listing the applicable considerations).

Lastly, "[t]he government has the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of the case, the waiver was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a know right or privilege." <u>United States v. Black Bear</u>, supra at 663, citing <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004)[en banc], cert. denied, 543 U.S. 1145 (2005).

2.      <u>Legal Analysis</u>. There is no question that the Defendant was advised of his rights under <u>Miranda</u>, and therefore, the issue presented is whether the Defendant, upon being apprised of those rights, effectively waived them, and whether the subsequent statements were voluntary. The Defendant argues that the Government has a high burden to meet, in order to show waiver and voluntariness, and that it has not met that burden here. As urged by the Defendant, his statement that he had "nothing to hide" does not demonstrate a waiver, Pender's statements concerning the

Defendant's cooperation constitute promises of leniency, and those promises rendered the Defendant's statements involuntary. In response, the Government contends that the Defendant is an educated adult, who was not under the influence of substances, and who understood and waived his rights. In addition, the Government urges that no promises or threats were made to the Defendant, and that his statements were not the product of police coercion.

Upon our close review of the contents of the interrogation, we find that the Defendant made an unequivocal waiver. After reading the Defendant his <u>Miranda</u> rights, Pender asked the Defendant if he were willing to talk to the police, and the Defendant replied, "I have nothing to hide." The Defendant then confirmed that he understood the rights that had been read to him, and he proceeded to answer the questions posed. We find that, by those clear and simple statements, the Defendant unambiguously waived his rights. See, <u>United States v. Clarke</u>, 925 F.Supp. 1433, 1447 (W.D. Mo. 1996)("There is nothing equivocal or ambiguous about 'I have nothing to hide'."), reversed on other grounds, <u>United States v. Clarke</u>, 110 F.3d 612, 615 (8th Cir. 1997).

We further find that the Defendant's waiver was made intentionally, voluntarily, knowingly, and intelligently. The Defendant is an adult, a teacher, who

is without any known disabilities, and was, at the time of the questioning, without the mind altering influence of drugs or alcohol. Throughout the interrogation, the Defendant was engaged, he answered the questions thoughtfully, sometimes after a lengthy pause, he disagreed on occasion with Pender and Switajewski's characterizations, he asked for clarifications, and frequently he provided evasive answers. It is apparent that the Defendant viewed both Pender and Switajewski as adversaries, and was not influenced by any implied promises, from either before, or during the interrogation, that his cooperation would prove beneficial. Based on a totality of the circumstances, we find that the Defendant's will was not overborne, and that his statements were voluntary. See, United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002)(a promise of leniency will not necessarily render a confession involuntary); Williams v. Norris, 576 F.3d 850, 868 (8th Cir. 2009) (promises that the investigator would talk to the prosecutor about the defendant's cooperation are not promises of leniency); United States v. Granillo, 288 F.3d 1071, 1075-76 (8th Cir. 2002)(officer's statement that he would tell the prosecutor of the defendant's cooperation was not a false promise that would induce involuntary confession); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988)(officer made promises about providing rehabilitation services, but the evidence showed that the defendant

was aware that the police officer was an adversary, and that confessing would be risky); <u>United States v. Kilgore</u>, 58 F.3d 350, 353 (8th Cir. 1995)(mistaken belief that promise of leniency had been made, where it had not, not enough on its own to show involuntariness).  Accordingly, we find that the Government has satisfied its burden to demonstrate that the Defendant made a knowing, voluntary, intentional, and intelligent waiver of his rights, and that his statements were voluntarily given.

Further, based on the foregoing analysis, we also conclude that the voluntariness of the Defendant's statements weighs in favor of attenuation, assuming an illegal arrest, between the arrest and the statements.  Therefore, we find that, even if we concluded that the Defendant's arrest had been unlawful -- and we do not so conclude -- we would, nonetheless, find that the intervening circumstances, the lack of police misconduct, and the Defendant's voluntary waiver of his <u>Miranda</u> rights, outweigh the short time lapse between his arrest and interrogation, such that the Defendant's statements were sufficiently attenuated, so as to stave off suppression.

In sum, we recommend that the Defendant's Motion to Suppress Statements be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion to Suppress Statements [Docket No. 12] be denied.

2.     That the Defendant's Motion to Suppress Evidence Obtained by Search and Seizure [Docket No. 13] be denied.

Dated:  December 2, 2009                         *s/Raymond L. Erickson*
                                                 Raymond L. Erickson
                                                 CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **December 16, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **December 16, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.